UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CARLOS MENDOZA, individual, and as
guardian of L.M., his minor child,

                        Plaintiffs,

        v.

CITY OF VANCOUVER, a Municipality;
VANCOUVER POLICE DEPARTMENT,
an agent of the City of Vancouver;
MONICA HERNANDEZ and "JOHN
DOE" HERNANDEZ, husband and wife,
individually and the marital community
thereof; BARBARA KIPP and "JOHN
DOE" KIPP, husband and wife and the
martial community thereof,

                        Defendants.

CASE NO. 16-5677 RJB

ORDER ON CROSS MOTIONS
FOR SUMMARY JUDGMENT
AND OTHER MOTIONS AND
ORDER TO SHOW CAUSE

        This matter comes before the Court on the Defendants' Motion for Summary Judgment

(Dkt. 58) and Plaintiffs' Motion for Partial Summary Judgment (Dkt. 68), Plaintiffs' two Motion

to Strike (Dkts. 68 (refiled at 86 and 87); and 97) and Defendants' Renewed Motion to Exclude

Gregory Gilbertson (Dkt. 73). The Court has considered the pleadings filed in support of and in opposition to the motions and the file herein.

Plaintiffs filed this case asserting that their constitutional rights were violated when Plaintiff Carlos Mendoza was arrested and his son, Plaintiff L.M., was taken into protective custody. Dkt. 4-4. Plaintiffs seek damages as well as attorneys' fees and costs. *Id.* Defendants move for summary dismissal of all claims (Dkt. 58) and Plaintiffs move for summary judgment on the issues of whether Defendant Vancouver Police Department Detective Monica Hernandez had legal authority to arrest Plaintiff Mendoza, whether Defendant Vancouver Police Department Detective Sergeant Barbara Kipp had legal authority to take L.M. into custody, and whether Defendant Kipp had cause to believe L.M. had been neglected (Dkt. 68). For the reasons provided, the Defendants' motion (Dkt. 58) should be granted, in part, and stricken, in part; Plaintiffs' motion for partial summary judgment (Dkt. 68) should be denied as it relates to the federal claims, and stricken as it relates to the state law claims; Plaintiffs' motions to strike (Dkts. 68 (refiled at 86 and 87) and 97) should be denied; and Defendants' Renewed Motion to Exclude Gregory Gilbertson (Dkt. 73) should be stricken. Further, the parties should be ordered to show cause, if any they have, why this Court should not decline to exercise supplemental jurisdiction over the state law claims and remand the case to Clark County, Washington Superior Court.

## I.    <u>RELEVANT FACTS AND PROCEDURAL HISTORY</u>

This case involves an unusual number of people. Attached to the order is a list of parties, witnesses and others, with a brief explanation of their roles.

### A.  RELEVANT FACTS

On April 23, 2014, the Washington State Department of Social and Health Services ("DSHS") filed a dependency petition in Clark County, Washington Juvenile Court alleging that Plaintiff Mendoza's son, L.M., was dependent because of abuse allegations against the child's mother, Tara Mendoza. *In re Dependency of L.M.,* Clark County Superior Court case number 14-7-00508-5, in the record at Dkt. 59-12, at 2-8. L.M., who at the time was a year old, had a total of eight broken bones in his arms and legs. *Id.* Tara Mendoza was arrested by Defendant Hernandez around April 30, 2017, on charges of first degree assault of a child. *Washington v. Tara Mendoza,* Clark County, Washington Superior Court case number 14-5521, in the record at Dkt. 60-1, at 10. On May 1, 2014, a no-contact order was entered in the criminal case preventing Tara Mendoza from having contact with L.M. *Washington v. Tara Mendoza,* Clark County, Washington Superior Court case number 14-5521, in the record at Dkt. 76-1, at 20.

Plaintiff Mendoza, an E2 in the United States Marines, was stationed at Meridian Naval Air Station in Meridian, Mississippi for a ten day training program (which occurred right after he graduated from boot camp). Dkt. 84, at 3, refiled as redacted at Dkt. 90. He was notified of the allegations regarding Tara Mendoza and L.M. around April 23, 2014. Dkt. 60-1, at 15. On April 29, 2014, he received orders and flew to his first permanent duty station in North Carolina. Dkt. 84, at 3, refiled as redacted at Dkt. 90.

After receiving permission from his North Carolina command for two days of emergency humanitarian leave, on Thursday night, May 1, 2014, Plaintiff arrived in Vancouver, Washington. Dkt. 84, at 3, refiled as redacted at Dkt. 90. Plaintiff Mendoza was ordered to check in with Swan Island Oregon Reserves Station in Portland, Oregon ("Swan Island"), to attempt to get a temporary transfer to a Marine unit there in order to address his family issues. *Id.* (Vancouver, Washington and Portland, Oregon are separated only by the Columbia River).

He states that "as a new Marine" he did not fully "understand how things worked," and arrived without the leave order paperwork in his possession. *Id.* His temporary leave expired at midnight on May 2, 2014, and he had to return to North Carolina if he did not get the temporary transfer to Swan Island. *Id.*

The next morning, May 2, 2014, he attended a juvenile court hearing at 9:00 a.m. across from the main Clark County, Washington courthouse and jail. Dkt. 84, at 3, refiled as redacted at Dkt. 90. According to Plaintiff Mendoza, around 10:30 or 11:00 a.m., he walked over to the jail to speak to his then wife, Tara Mendoza, about the situation. *Id.* (The jail has a rule that new arrests can't have visitors for 72 hours, but Plaintiff Mendoza states he was not informed of this rule). *Id.* He talked to the person on the front desk, explained that he only had two days leave, that he left his paperwork in North Carolina, and was going to try to get attached to the Marines at Swan Island, but had not talked to them yet. *Id.*, at 3-4. Plaintiff Mendoza claims that he said that he was not sure if he could get attached to Swan Island, and that if not, he would have to return to North Carolina. *Id.*, at 4. Plaintiff Mendoza stated that he was told he would have to see a supervisor. *Id.* Plaintiff Mendoza explained his situation again, and stated that the supervisor told him to return around 5:00 p.m. and that they could "make it happen." *Id.*

Scott Pilakowski, the corrections sergeant and supervisor on duty at the jail for the Clark County Sheriff's Office that day, filed a declaration in this case that states that Plaintiff Mendoza told him that he had to return to North Carolina and that he was attempting to get an extension to the United States Marine Corps office in Portland, "but that his request was not granted." Dkt. 21, at 2. Sergeant Pilakowski further states that based on Plaintiff Mendoza's statements, he allowed Plaintiff Mendoza to visit Tara Mendoza. *Id.*

Plaintiff Mendoza states that he then drove to the Swan Island base, arriving around 1:00 p.m. Dkt. 84, at 4, refiled as redacted at Dkt. 90. He spoke to a female Marine, who he asserts told him that they would have to verify his information with North Carolina because he arrived without his leave paperwork. *Id.* Plaintiff asserts that around 3:00 or 4:00 p.m., he received a call from "Sgt. Wick who told [him] they had verified the information with [his] North Carolina command and they would officially attach [him] the following day." *Id.,* at 5.

Plaintiff Mendoza states that he returned to the jail at 5:00 p.m. and visited Tara Mendoza for about an hour. *Id.* He did not tell the jail personnel that his transfer to Swan Island had been approved.

Defendant Hernandez states that she recognized Plaintiff Mendoza as he entered the jail and made contact with him after he visited with Tara Mendoza. Dkt. 60, at 3. (Earlier that day Defendant Hernandez called the jail and asked if Tara Mendoza's property had been released; she asserts that they told her it had been released to Karen Ruggiero, a friend of Tara Mendoza and a witness in the child abuse case. Dkt. 60-1, at 18. She maintains that she then called Karen Ruggiero who told her that she gave Tara Mendoza's wallet and cell phone to Plaintiff Mendoza around 8:00 a.m. that day. Dkt. 60-1, at 18.) Defendant Hernandez states that she asked Plaintiff Mendoza if he had Tara Mendoza's cell phone or iPad. Dkt. 60-5, at 4. Plaintiff Mendoza told her he had the iPad in his vehicle, but did not know where Tara Mendoza's cell phone was. Dkt. 60-1, at 19. Around 9:00 p.m., Plaintiff Mendoza signed a consent form and agreed to allow Defendant Hernandez to search his vehicle. Dkt. 60-4, at 2. She found the iPad. Dkt. 60, at 3. Defendant Hernandez told Plaintiff Mendoza not to contact anyone involved in the case for the next three hours while she served search warrants related to the criminal case against Tara Mendoza, and he agreed. Dkt. 60-5, at 4.

According to Defendant Hernandez, while serving the last warrant, Katherine Ruggiero showed up on the scene looking for Taryn Park's (another witness to the child abuse case) cell phone. Dkt. 60-5, at 4. Defendant Hernandez stated in her police report that Ruggiero told her that she didn't know that a warrant was being served for Taryn Park's phone, but that about 30 minutes prior, Plaintiff Mendoza told her to get to Park's house and get Park's phone. *Id.* (In a written statement Ruggiero stated that Plaintiff Mendoza asked about **pictures** of [L.M.] the night he was taken into CPS custody, and she told him "on Tye's phone" and "he asked could [she] obtain them," and she agreed. Dkt. 60-8, at 4. When Ruggiero asked him what was going on, [Plaintiff Mendoza] told her he couldn't tell her then, but to call him at 2:30 a.m. *Id.*) Ruggiero also purportedly stated to Defendant Hernandez that she thought Tara Mendoza's phone was at Sandra Schatz's residence because Plaintiff Mendoza and she discussed Schatz keeping the phone because Schatz was not involved in the case. Dkts. 60-5, at 4 and 60-8, at 2.

In a supplemental police report, Defendant Hernandez states that she called the Clark County jail and spoke with Custody Officer Paddy on May 5, 2014. Dkt. 60-9, at 2. According to her, Custody Officer Paddy was working at the visitor's desk around 5:00 p.m. on May 2, 2014 when Plaintiff Mendoza was trying to get into the jail to see Tara Mendoza. *Id.* Custody Officer Paddy asserted that Plaintiff Mendoza told him "he may be shipped overseas and that he had to leave the next day." *Id.* Custody Officer Paddy stated that Plaintiff Mendoza then met with the supervisor to discuss his situation. *Id.* In a separate supplemental police report, Defendant Hernandez states that Custody Officer Paddy and Sergeant Pilakowski were contacted again on May 6, 2014 about 6:00 a.m. regarding Plaintiff Mendoza and his visit with Tara Mendoza in the jail on May 2, 2014. Dkt. 60-1, at 20. Detective Hernandez relates:

> Custody Officer Paddy said [Plaintiff Mendoza] was in his dress uniform when he told him he was going overseas but would like to meet with his wife before he

left. Custody Officer Paddy notified Custody Sergeant Pilakowski and Sergeant Pilakowski spoke with [Plaintiff Mendoza] alone. [Plaintiff Mendoza] told Sergeant Pilakowski he was trying to get permission from the Portland office to stay in the area but it was not granted. He also said [Plaintiff Mendoza] told him that the military doctor had reviewed the medical records pertaining to L. and that there was only one fracture and that it was the doctor's opinion that it was not child abuse. Sergeant Pilakowski said that he then obtained permission from the commander to allow [Plaintiff Mendoza] a visit.

Dkt. 60-1, at 20. Defendant Kipp states in a police report that she spoke to Sergeant Pilakowski at Defendant Hernandez's request. Dkt. 61-1, at 3. Defendant Kipp asked Sergeant Pilakowski if Plaintiff Mendoza "wanted the rules changed to accommodate him and [Sergeant Pilakowski] said that [Plaintiff Mendoza] did not specifically ask that." Dkt. 61-2, at 3.

According to Defendant Hernandez, before 9:00 a.m. on May 6, 2014, she contacted U.S. Marine Corp Major Chad Hailey at Swan Inland. Dkt. 60, at 3-4. Major Hailey stated that on May 2, 2014 around 2:00 p.m. he told Plaintiff Mendoza that he would be allowed to stay in Washington through the duration of the [dependency] case involving L.M. Dkt. 60, at 3-4.

On May 6, 2014, Plaintiff Mendoza attended a 9:00 a.m. shelter care hearing for his son in his dress military uniform. Dkt. 76-1, at 9. He was granted supervised visitation with L.M. three times a week for two hours a visit. Dkt. 59-13, at 2.

Right after the hearing, Defendant Hernandez arrested Plaintiff at the courthouse for the misdemeanor of making a false statement to a public servant when requesting to visit Tara Mendoza on May 2 at the jail. Dkt. 60, at 4. Defendant Hernandez did not place Plaintiff Mendoza in her car, which was in the courthouse parking lot, but, instead, walked him, handcuffed, two blocks away to the police station. Dkt. 60, at 4-6.

Plaintiff Mendoza was detained until that evening at which time he posted bail and was released. Dkt. 76-1, at 15. He was charged with the misdemeanor of making a false or

misleading material statement to a public servant contrary to RCW 9A.76.175. *City of Vancouver v. Mendoza,* Clark County, Washington District Court case number 136892.

The next day, on May 7, 2014, Defendant Hernandez served a warrant for Tara Mendoza's phone at Sandra Schatz's residence. Dkt. 60-5, at 4. Although the police did not find the phone during the search, Schatz told them Plaintiff Mendoza had discussed her keeping the phone and he had access to her property. Dkt. 60-5, at 4 and 60-8, at 3. Schatz later called the police, reported she found Tara Mendoza's phone, and turned it over to them. Dkt. 60-5, at 4.

Plaintiff Mendoza was charged with tampering with evidence in connection with his handling of Tara Mendoza's cell phone and criminal conspiracy with Sandra Schatz to conceal the cell phone from police. *City of Vancouver v. Mendoza,* Clark County, Washington District Court case number 136893. Plaintiff Mendoza was further charged with obstructing a law enforcement officer related to sending Ruggiero over to Park's house the night he was told not to discuss the case with anyone while Defendant Hernandez was serving warrants. *City of Vancouver v. Mendoza,* Clark County, Washington District Court case number 136894.

Although Plaintiff Mendoza and Tara Mendoza attempted to reconcile their marriage for a few months, after Tara Mendoza hit Plaintiff Mendoza with her car in July of 2014, a no contact order was entered protecting Plaintiff Mendoza from contact with Tara Mendoza. *Washington v. Tara Mendoza,* Clark County, Washington Superior Court case number 14-1-01578. A separate no contact order was entered on August 5, 2014, protecting Plaintiff Mendoza and L.M. from having contact with Tara Mendoza. *Mendoza v. Mendoza,* Clark County, Washington Superior Court no contact order number 14-2-07709-6; in the record here at Dkt. 76-1, at 22-25. Tara Mendoza pled guilty to assault in the third degree – domestic violence on October 23, 2014, and was sentenced to jail time. *Washington v. Tara Mendoza,* Clark County,

Washington Superior Court case number 14-1-01578, Judgement and Sentence in the record at Dkt. 76-1, at 26-38.

Plaintiff Mendoza filed a Petition for Declaration Concerning Validity of Marriage (asserting the Mendozas' marriage was invalid because the divorce from her first marriage was not final when they married) and requested that the court enter a parenting plan regarding L.M. on August 28, 2014. *In re the Marriage of Carlos and Tara Mendoza,* Clark County, Washington Superior Court case number 14-3-01748-8. The marriage was found not to be valid. Dkt. 76-1, at 8. On September 17, 2014, a parenting plan was entered, prohibiting contact between Tara Mendoza and L.M. *In re the Marriage of Carlos and Tara Mendoza,* Clark County, Washington Superior Court case number 14-3-01748-8, in the record at Dkt. 76-1, at 39-45.

On November 25, 2014, Plaintiff Mendoza moved to have the first dependency case dismissed. *In Re the Interest of: [L.M.]*, Clark County, Washington Juvenile Court case number 14-7-00508-5, in the record at Dkt. 76-1, at 17. In his Declaration in support of the motion, Plaintiff Mendoza informed the Court that Tara Mendoza's criminal trial on the child abuse charges was scheduled to go to trial in January of 2015. *Id.*, at 18. He notified the Court that there was "a no-contact order in the criminal case (14-1-00877-5) preventing [Tara Mendoza] from having contact with [L. M.]," a "no-contact order in a protection order matter that [Plaintiff Mendoza] filed (14-2-07709-6), preventing [Tara Mendoza] from contacting [Plaintiffs], a "non-contact order preventing [Tara Mendoza] from having contact with me in the domestic violence assault case against [Tara Mendoza] (14-1-01578-0), and a "no visitation clause in the temporary parenting plan [Plaintiff Mendoza] obtained on September 17, 2014 (14-3-01748-8)." *Id.* Plaintiff Mendoza further stated that he was in the military, being stationed out of state, and had

housing and daycare arranged for L.M. *Id.* He asserted that he understood DSHS is "not opposed to a dismissal under these circumstances, as [L.M.] is and shall remain protected under [his] care." *Id.*, at 19.

Tara Mendoza was released from custody on bail around November 24, 2014. Dkt. 61-2, at 2. A few days later, DSHS received a report that Tara Mendoza made contact with L.M. via Skype in violation of the no contact orders. *Id.*

On December 4, 2014, the dependency case was dismissed; the court was not informed that Tara Mendoza had allegedly made contact with L.M. Dkt. 76-1, at 46-47.

On December 8, 2014, Plaintiff Mendoza filed a motion in the criminal case *Washington v. Tara Mendoza,* Clark County, Washington Superior Court case number 14-1-01578-0, (charges related to Tara Mendoza hitting Plaintiff Mendoza with her car), to have the no contact order between Plaintiff Mendoza and Tara Mendoza dismissed. Dkt. 98, at 29. Plaintiff Mendoza stated:

> CPS dismissed their action against my wife and I as relates to our son L. Based upon all information I have received to date I intend to facilitate reunification of the relationships damaged by what appear to be untrue allegations. As to this incident I acknowledge it occurred but have no fear of her and I want her in our son's life.

*Id.*

On December 9, 2014, Plaintiff Mendoza moved to have the August 5, 2014 no contact order (which was entered after Tara Mendoza hit Plaintiff Mendoza with her car) between Tara Mendoza and both Plaintiffs lifted before they left for North Carolina. *Mendoza v. Mendoza,* Clark County, Washington Superior Court case number 14-2-07709-6; in the record here at Dkt. 76-1, at 48. In his motion, Plaintiff Mendoza states, "[DSHS] dismissed their action against vs. (petitioner and respondent) as it related to our son [L.M.] Based on all information I have

received to date I intend to facilitate reunification of the relationships damaged by what appear to be untrue allegations." Dkt. 76-1, at 48.

On December 10, 2014 at 9:53 a.m., Colin Hayes, the Clark County deputy prosecutor who was handling Tara Mendoza's criminal prosecution, emailed Defendants Kipp and Hernandez (she was not working), and several other social workers, DSHS employees, and the assistant attorney general, Sarra Yamin, who was assigned to the first dependency case. Dkt. 61-3, at 2. He sent them a copy of Plaintiff Mendoza's December 8, 2014 motion to have the protective order between he and Tara Mendoza dismissed. *Id.* Mr. Hayes notes that "apparently [Plaintiff Mendoza] wants Tara [Mendoza] to see L.[M.] again." *Id.*

At 1:29 p.m., Mr. Hayes again emailed Defendant Kipp and the others, and informed them that "Cheri Hoffman [a volunteer victim's advocate] just spoke with [Plaintiff Mendoza] in an effort to have him sign a HIPPA release . . . [Plaintiff Mendoza] told Cheri that he is in North Carolina." Dkt. 61-4, at 2. (That Plaintiffs were in North Carolina was not anticipated by the Defendants; they were under the impression he was in California based on what Plaintiff Mendoza told the assistant attorney general Yamin and others at DSHS in order to get the first dependency dismissed. Dkts. 61-4, at 2 and 28, at 4. Plaintiff Mendoza states that it wasn't until December that he decided to go to North Carolina. Dkt. 69-1, at 45.) Defendant Kipp relates in her police report that she talked with Ms. Hoffman. Dkts. 28, at 4 and 69-1, at 18-19. According to Defendant Kipp, Ms. Hoffman told her that she talked with [Plaintiff Mendoza] and he very clearly stated that he was in North Carolina, and gave her an address to mail documents. *Id.* (Plaintiff Mendoza disputes this and asserts he told her he was on his way to North Carolina, not that he was already there. Dkt. 84, at 9, refiled as redacted at Dkt. 90).

In any event, at 1:55 p.m. Beth Kutzera with DSHS emailed Defendant Kipp and asked if she had Tara Mendoza's release address and Defendant Kipp responded at 2:02 p.m. that she would try to find it. Dkt. 61-5, at 2. (Although at 2:25 p.m. Mr. Hayes sent Defendant Kipp and others an email that giving an address he "believed" was Tara Mendoza's and included a possible phone number, Defendant Kipp states that she doesn't remember seeing this email. Dkts. 61-6, at 2 and 61, at 3.)

Defendant Kipp states that at this point she became "very concerned" that Plaintiff Mendoza "was planning to expose L.M. to Tara Mendoza." Dkt. 61, at 3.

By 3:00 p.m., Tara Mendoza's whereabouts had still not been confirmed, Defendant Kipp states that she "believed that L.M. was in imminent danger." Dkt. 61, at 3. She requested that the Vancouver Police Department "ping" Plaintiff Mendoza's cell phone, and discovered that he was in Vancouver, not North Carolina. Dkts. 61, at 3 and 64, at 2-3.

Vancouver police officers went to the last known location of Plaintiff Mendoza's cell phone and found Plaintiff Mendoza's car. Dkt. 64, at 3. Clark County Deputy Sheriff Brendan McCarthy began drafting an affidavit for a warrant to take L.M. back into protective custody. Dkt. 62, at 2-4. While he was drafting the warrant, the officers at the scene saw Plaintiff Mendoza get into his car and drive off. Dkt. 64, at 3. They followed, but were rear-ended by a truck and had to stop. *Id*. Deputy McCarthy quit drafting the proposed warrant to take L.M. back into protective custody and attempted to join the others following Plaintiffs, but did not find them. Dkt. 62, at 2-4. Defendant Kipp, who was on the scene, followed Plaintiffs. Dkt. 28, at 5.

It turns out that Plaintiff Mendoza's soon to be new wife, Yesenia, who was in Newburg, Oregon (just over the Washington/Oregon border) contacted Plaintiff Mendoza and asked him to take her to the hospital. Dkt. 69-1, at 52-53. (He and Yesenia started dating in September of

2014. *Id.*)  He put L.M. in the car seat, and drove over the Washington state border into Oregon. *Id.*

Defendant Kipp followed Plaintiffs from their home over the Oregon border.  Dkts. 28, at 5 and 69-1, at 19.  She believed she had the authority to follow Plaintiffs pursuant to the Master Interlocal Mutual Law Enforcement Assistance Agreement ("Interlocal Agreement") between the State of Washington and State of Oregon.  Dkt. 77, at 20.  It was around 6:00 p.m. and traffic was heavy.  Dkts. 28, at 5 and 69-1, at 19.  Defendant Kipp inadvertently pulled up along Plaintiffs' car and saw Plaintiff Mendoza driving and L.M. in the backseat in a child car seat.  *Id.* She slowed down and got three cars behind them.  *Id.*  As they drove, she notified the Portland Police Bureau and kept "calling out" their location to Portland police as they approached the Tigard, Highway 99 Exit.  *Id.*  Eventually, the Portland police caught up to them, and pulled Plaintiff over at Defendant Kipp's request.  *Id.*; and Dkt. 69-1, at 32.

Defendant Kipp approached and questioned Plaintiff Mendoza about his motion to have the no contact order lifted.  Dkts. 28, at 5 and 69-1, at 19.  She states that Plaintiff Mendoza initially denied having filed the motion, and then admitted it.  *Id.*  Defendant Kipp asked if Plaintiff Mendoza if he know where Tara Mendoza was and whether he was attempting to take L.M. to see Tara Mendoza.  *Id.*  He said "no" to both questions.  *Id.*  He told her that he decided not to go forward with the motion to dismiss the no contact order.  *Id.*  Defendant Kipp asked him why he told DSHS that he would be in California and then told Ms. Hoffman that day that he would be in North Carolina, to which he asserted he "mis-spoke."  *Id.*  Defendant Kipp took L.M. and turned him over to DSHS social worker.  *Id.*

A second dependency petition for L.M. was filed by DSHS on December 15, 2014. *Dependency of L.M.,* Clark County Superior Court case number 14-7-01141-7; in record at 59-

16.  In addition to recounting the history in the first dependency case, as justification for opening this second dependency, the state pointed to Plaintiff Mendoza's motion, on December 8, 2014, to have the no contact order that was entered in the criminal case (where Tara Mendoza hit Plaintiff Mendoza with her car) between Plaintiff Mendoza and Tara Mendoza dismissed.  *Id.*  The state argued that the statements Plaintiff Mendoza made in the motion to have the no contact order lifted, "were in stark contrast to statements previously made by [Plaintiff Mendoza] . . . and is not supported by any of the medical experts who have provided care and diagnosis of [L.M.]."  *Id.,* at 4.  Further, the petition stated that Tara Mendoza was released from custody in November of 2014, that they had information that Tara Mendoza had Skype contact with [L.M.] shortly after her release.  *Id.*, at 9.  The court opened the dependency, and several shelter care hearings were conducted.  Dkts. 59-17, 59-18, 59-19, 94-1, at 3.

DSHS social worker Michael Wenndorf, who was assigned to the second dependency, stated in his report that on January 21, 2015, during a supervised visit between Plaintiffs, Plaintiff Mendoza advised him that "over the weekend, he realized some things he had not [realized] previously.  [Plaintiff Mendoza] spent time talking with [co-workers, family and friends] and realize[d] he ha[d] never been willing to view Tara [Mendoza] as a possible perpetrator . . ."  Dkt. 80, at 5.

During a February 17, 2015 shelter care hearing, after several days of testimony, Clark County Commissioner Schienberg held that there was reasonable cause to keep L.M. out of Plaintiff Mendoza's care based on his lack of credibility and failure to protect L.M.  Dkts. 59-19, at 22 and 94-1, at 2-11.  In making her determination she noted that Plaintiff Mendoza was facing criminal charges that dealt with "his honesty" and "with him choosing to protect the alleged perpetrator of his son's injuries."  Dkt. 59-19, at 8.  In assessing Plaintiff Mendoza's

credibility, she found that he "lies by omission. He lies by telling half the story and he lies by telling half-truths." *Id.*, at 9. The court indicated that the prior dependency was relevant in her assessment of his credibility. *Id.*, at 9. It pointed out that "the reasons for the dismissal of the original dependency . . . was because he told us . . . when we were dismissing [the first dependency] he was going to California, he had to leave immediately, and that's where he was going to be stationed, and he was leaving like the next day or day after." *Id.* Contrary to what he told them, the court heard testimony from Plaintiff Mendoza's military supervisor that Plaintiff Mendoza "knew before he even went to court on the day it was dismissed he knew he wasn't going to California and that he was going . . . to North Carolina." *Id.*, at 10. The court pointed out that he moved to have the no contact orders rescinded in December right after the first dependency was dismissed, finding: "the reality is if you read it in its entirety the plain language of the declaration states that the purpose of the motion was for reunification between all parties and specifically to enable the alleged perpetrator of the assault to have access to the child." *Id.*, at 14. The court found that Plaintiff Mendoza "doesn't really believe that [Tara Mendoza's] guilty of harming his child" and "if there wasn't a restraining order in effect in the criminal matter that [Plaintiff Mendoza] would clearly allow [Tara Mendoza] to not only have contact, but possibly have custody of this child. So, there is an imminent risk." *Id.*, at 16 and 17.

On April 27, 2015, the second dependency case was dismissed. Dkt. 84, at 10-11, refiled as redacted at Dkt. 90. L.M. now lives with Plaintiff Mendoza (who is still a Marine), his wife Yesenia (they married in February 2015), and her other children in North Carolina. *Id.*, at 11.

On June 11, 2015, Plaintiff Mendoza pled guilty to "Disorderly Conduct 9A.84.030 Blocking Traffic," an amended charge to the misdemeanor charge of making a material misstatement to a public servant. *City of Vancouver v. Mendoza*, Clark County District Court

case number 136892; Dkts. 59-2, at 2 and 59-3. Plaintiff Mendoza stated in his plea:
"Alford/Newton plea – I do not believe I am guilty of the crime charged but plead guilty to take advantage of the prosecutor's deal because I recognize a jury could find me guilty if they believed state's witnesses and not me." Dkt. 59-3, at 3. The charges that he tampered with evidence (Tara Mendoza's cell phone around May 2, 2014), conspired with Sandra Schatz (to conceal the cell phone from police around May 2, 2014) and obstructed a law enforcement officer were dismissed in a global resolution with the disorderly conduct plea. *City of Vancouver v. Mendoza,* Clark County District Court case number 136893; in the record at Dkts. 59-5, at 2-3 and 59-6, at 2; and *City of Vancouver v. Mendoza,* Clark County District Court case number 136894; in the record at Dkts. 59-7 and 9-8.

On October 28, 2015, Tara Mendoza pled guilty to assault of a child in the third degree in connection with her treatment of L.M. in the spring of 2014, and was sentenced to confinement. Dkt. 59-10, at 2-10.

## B. PROCEDURAL HISTORY

This case was filed on July 8, 2016 in Clark County, Washington Superior Court (Dkt. 2-1, at 8) and removed to this Court on August 2, 2016 (Dkt. 1). Plaintiffs assert federal claims against the Defendants for violations of: (1) Plaintiff Mendoza's fourth amendment right against being unlawfully seized on May 6, 2014, (2) both Plaintiffs' fourteenth amendment right to familial association, and (3) assert "*Monell*-related claims." Dkt. 2-1. They make state law claims for outrage, negligent infliction of emotional distress, malicious criminal prosecution, wrongful interference with family relations, false arrest, false imprisonment, and negligent investigation. *Id.*

In their response to Defendants' motion for summary judgment, Plaintiffs state that they are no longer asserting a claim for negligent infliction of emotional distress. Dkt. 83, at 12. This claim should be dismissed, and no further analysis is required.

### C. PENDING MOTIONS

Defendants now move for summary dismissal of all claims. Dkt. 58. They assert that there is no liability for Defendant Hernandez's arrest of Plaintiff Mendoza on May 6, 2014 under federal law because: his federal claim for violation of his fourth amendment rights should be dismissed because the claims are barred by *Heck v. Humphrey,* 512 U.S. 477 (1994), Defendant Hernandez had probable cause to arrest him, and she is entitled to qualified immunity. *Id.* Defendants assert that Plaintiffs' claims under state law related to Plaintiff Mendoza's May 6, 2014 arrest should also be dismissed. *Id.* Defendants move for dismissal of Plaintiffs' claim that Defendant Kipp violated their fourteenth amendment right to family unity when she took Plaintiff L.M. into protective custody on December 10, 2014 in Oregon, arguing that she is entitled to qualified immunity. *Id.* Defendants assert that the federal claims asserted against the City of Vancouver pursuant to *Monell* should be dismissed. *Id.* Defendants also argue that all the state law claims for taking a child into protective custody in emergent situations absent proof of gross negligence have been statutorily abolished, and so those claims should be dismissed. *Id.*

Plaintiffs respond and argue that the fourth amendment claim asserted against Defendant Hernandez should not be dismissed because the claim is not barred by *Heck*, there was no probable cause to arrest Plaintiff Mendoza, and she is not entitled to qualified immunity. Dkt. 83. Plaintiffs also oppose Defendants' motion for summary dismissal of their state law claims for outrage, malicious criminal prosecution, false arrest, and false imprisonment related to Plaintiff Mendoza's May 6, 2014 arrest. Dkt. 83, at 12-14. Plaintiffs argue that Defendant Kipp

lacked legal authority under the Interlocal Agreement and other statutes to take L.M. into

protective custody and violated various state laws (including kidnapping L.M.). *Id.* Plaintiffs

assert that Vancouver's Policy 17.15.00, and specifically 17.15.02C "is so deficient as to amount

to deliberate indifference to L.M.'s constitutional right" because it "omits from the written policy

the requirement that a child cannot be picked up without a court order." *Id.*

Defendants reply, arguing that all federal claims asserted against the Defendants

Hernandez and Kipp should be dismissed because they did not violate Plaintiffs' constitutional

rights and even if they did, they are entitled to qualified immunity. Dkt. 95. They assert that the

federal claims asserted against the City should be dismissed because there is no evidence the

policy caused Plaintiffs a deprivation of their constitutional rights (as opposed to not meeting

requirements in state statutes) and there is no evidence of deliberate indifference. *Id.*

Defendants also argue that all Plaintiffs' state law claims should be dismissed. *Id.*

Plaintiffs move for partial summary judgement on the following questions: (a) whether

Defendant Hernandez had legal authority to arrest Plaintiff Mendoza without a warrant on May

6, 2014 for a misdemeanor when the violation was not committed in her presence; (b) whether

Defendant Kipp "had probable cause to believe L.M. had been neglected;" and (c) whether

Defendant Kipp had legal authority under the Interlocal Agreement "when in Oregon to exercise

her authority under RCW 26.40.050 to remove a child located in Oregon from its parent without

a court order or warrant." Dkt. 68.

Defendants oppose the motion, arguing that whether Defendant Hernandez violated state law

when she arrested Plaintiff Mendoza for a misdemeanor is relevant only to his state law claims of

false arrest and false imprisonment, not the federal claims, and because Plaintiffs didn't file an

administrative claim with the City by May 6, 2016, as is required under state law, their motion

should be denied, and all claims related to this arrest should be dismissed. Dkt. 82. Defendants argue that Defendant Kipp had probable cause to believe that Plaintiff Mendoza was taking L.M. to see his abusive mother, and so was in imminent danger, and so the Plaintiffs' motion for summary judgment should be denied. *Id.* Defendants point out that Defendant Kipp was a sergeant-detective in a special law enforcement unit which, under the plain terms of the Interlocal Agreement, enabled her to take L.M. *Id.* They also assert that she was authorized by other state law, and so Plaintiffs motion should be denied. *Id.*

Plaintiffs reply, arguing that neither Defendants Hernandez nor Kipp had legal authority to act as they did, and Defendant Kipp did not have probable cause to take L.M. into protective custody. Dkt. 97.

Plaintiffs also file two motions to strike. Dkt. 68 and 97. Plaintiffs move to strike all hearsay evidence and evidence regarding events occurring after December 10, 2014. *Id.* Defendants filed a surreply in response. Dkt. 102.

### D. ORGANIZATION OF OPINION

This opinion will first address Plaintiffs' motions to strike (Dkts. 68, refiled at 86 and 87; and 97), and then Defendants' motion to disregard late filed and over length pleadings (Dkt. 95). The opinion will provide the standard on summary judgment, and then will address both parties' motions (Dkts. 58 and 68) as they relate to (1) Plaintiffs' federal fourth amendment claim against Defendant Hernandez for her arrest of Plaintiff Mendoza on May 6, 2014, (2) Plaintiffs' federal fourth and fourteenth amendment claims against Defendant Kipp as it relates her taking L.M. into protective custody on December 10, 2014, and (3) Plaintiffs' federal constitutional claims asserted against the City of Vancouver under *Monell.* Lastly, this opinion will issue an order to

show cause why this Court has original jurisdiction, and if it doesn't, why the state law claims should not be remanded to state court.

## II.    DISCUSSION

### A. PLAINTIFFS' MOTIONS TO STRIKE

To the extent that Plaintiffs move (Dkts. 83, refiled at 86, and 87) to strike portions of Defendants Hernandez and Kipp's police reports, search warrants, and other court documents as hearsay evidence, the motion should be denied to the degree the statements relate to whether Defendants Hernandez and Kipp thought they had probable cause to take the actions they did. "Police may rely on hearsay and other evidence that would not be admissible in a court to determine probable cause:  Probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Hart v. Parks*, 450 F.3d 1059, 1066 (9th Cir. 2006).  To the extent Plaintiffs move to strike other portions of the police reports and court documents, the motion should be denied; but the evidence was of little utility in deciding this motion.

To the extent Plaintiffs move to strike evidence submitted regarding events occurring after December 10, 2014 as irrelevant (Dkt. 97) the motion should be denied.  Although the information submitted was of marginal use, it provided further background and context for these events.

### B. LATE FILED PLEADINGS

To the extent that Defendants move the Court to refuse to consider Plaintiffs' pleadings, most of which were filed at least a few days late and some of which were over-length, the motion should be denied.  There is a "strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits" whenever possible. *Eitel v. McCool,* 782 F.2d 1470, 1472 (9th

Cir. 1986).  Accordingly, it is error for a district court granted partial summary judgment "solely on the basis of [a] local rule violation." *Henry v. Gill Indus., Inc.,* 983 F.2d 943, 950 (9th Cir. 1993).

**C.  SUMMARY JUDGMENT STANDARD**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect. Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts

specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

## D. FEDERAL CLAIM FOR VIOLATION OF THE FOURTH AMENDMENT RELATED TO THE MAY 6, 2014 ARREST OF PLAINTIFF MENDOZA

Plaintiff was arrested for violation of RCW § 9A.76.175, which provides:

> A person who knowingly makes a false or misleading material statement to a public servant is guilty of a gross misdemeanor. "Material statement" means a written or oral statement reasonably likely to be relied upon by a public servant in the discharge of his or her official powers or duties.

The Defendants move, in part, for dismissal of Plaintiff Mendoza's Fourth Amendment claim related to his May 6, 2014 arrest arguing that Plaintiff Mendoza's Fourth Amendment rights were not violated because Defendant Hernandez had probable cause to arrest him, and even if she did not have probable cause, she is entitled to qualified immunity. Dkt. 58. The Court need not reach the other grounds Defendants assert because Defendant Hernandez should be granted qualified immunity. Plaintiffs move for summary judgement on a related question: whether Defendant Hernandez had legal authority to arrest Plaintiff Mendoza without a warrant for a misdemeanor committed outside her presence? Dkt. 68.

### 1. *Defendants' Motion - Qualified Immunity on the Fourth Amendment Claim Brought under § 1983?*

In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct complained of was committed by a person acting under color of state law, and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other*

*grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present.  *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

Defendants in a Section 1983 action are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Harlow v. Fitzgerald*, 457 U.S. at 815. The existence of qualified immunity generally turns on the objective reasonableness of the actions, without regard to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable officer could have believed his or her conduct was proper is a question of law for the court and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872-73 (9th Cir. 1993).

In analyzing a qualified immunity defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case.  *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001).  This Court has discretion to consider the second *Saucier* factor first, "whether the right was clearly established," *Pearson,* at 236, and will do so here.

"The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Id*. The plaintiff bears the burden of proving that the particular federal right alleged to have been violated was clearly established at the time. *Pearson v. Callahan,* 555 U.S. 223 (2009).

The Fourth Amendment to the United States Constitution protects people against "unreasonable searches and seizures." "The 'reasonableness' and hence constitutionality of a warrantless arrest is determined by the existence of probable cause." *Barry v. Fowler, 902 F.2d 770, 772* (9th Cir. 1990). "Probable cause requires only that those facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed an offense." *Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015)(*cert. denied sub nom. Yousefian v. City of Glendale, Cal*., 136 S. Ct. 135 (2015))(*internal quotations and citations omitted*). "[A]n officer may not ignore exculpatory evidence that would 'negate a finding of probable cause.'" *Id., (quoting Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003)). "Probable cause is an objective standard. The arresting officers' subjective intention . . . is immaterial in judging whether their actions were reasonable for Fourth Amendment purposes." *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir. 2007).

"Even if the arrest was made without a warrant and without probable cause, however, the officer may still be immune from suit if it was objectively reasonable for [them] to believe that [they] had probable cause." *Rosenbaum v. Washoe Cty*., 663 F.3d 1071, 1078 (9th Cir. 2011). "The law acknowledges that an otherwise competent officer will sometimes make an unreasonable decision or make an unreasonable mistake as to law or fact. In those instances, the officer will appropriately be liable under § 1983." *Id.* "Framing the reasonableness question somewhat differently, the question in determining whether qualified immunity applies is whether all reasonable officers would agree that there was no probable cause in this instance." *Id.*

Defendant Hernandez should be granted qualified immunity on the federal claims (not state claims) related to whether she had probable cause to arrest Plaintiff Mendoza on May 6, 2014 for knowingly making a false or misleading material statement to a public servant contrary to RCW § 9A.76.175. There is not a sufficient showing that "all reasonable officers would agree there was no probable cause." *Rosenbaum,* at 1078.

Defendant Hernandez saw Plaintiff Mendoza in his military uniform at the jail around 5:00 p.m. on May 2, 2014 in the waiting area. Dkt. 60-1, at 18. When Defendant Hernandez arrested Plaintiff Mendoza, she knew that Custody Officer Paddy and Sergeant Pilakowski were both working at the jail when Plaintiff Mendoza went to see Tara Mendoza around 5:00 p.m. on May 2, 2014. Dkt. 60-9, at 2 and 60-1, at 20. Custody Officer Paddy told her that Plaintiff Mendoza told him "he may be shipped overseas and that he had to leave the next day." *Id.* Custody Officer Paddy related that Plaintiff Mendoza then met with the supervisor to discuss his situation. *Id.* Defendant Hernandez knew that Sergeant Pilakowski reported that Plaintiff Mendoza "was trying to get permission from the Portland office to stay in the area but it was not granted. He also said [Plaintiff Mendoza] told him that the military doctor had reviewed the medical records pertaining to L. and that there was only one fracture and that it was the doctor's opinion that it was not child abuse." Dkt. 60-1, at 20. She was aware that Sergeant Pilakowski "then obtained permission from the commander to allow [Plaintiff Mendoza] a visit." Dkt. 60-1, at 20. Defendant Hernandez was also aware from Major Hailey (the Marine she spoke with at Swan Island) that Plaintiff Mendoza was informed on May 2, 2014, around 2:00 p.m., that he would be allowed to stay in Washington through the duration of the dependency case involving L.M. Dkt. 60, at 3-4.

Defendant Hernandez was entitled to rely on hearsay in deciding whether there is sufficient probable cause for arrest, *Hart v. Parks*, 450 F.3d 1059, 1066 (9th Cir. 2006), and the two jail officers and Marine she talked with appear to have given "reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir. 2007). Although Plaintiff Mendoza points out that he talked with the jail officers late morning on May 2, 2014, and then returned for the visit, there is no evidence that Defendant Hernandez was aware the conversations with jail staff occurred **before** Plaintiff was granted permission to stay, and in any event, he did nothing to correct the misinformation after he became aware that he could stay. Further, while Plaintiff Mendoza maintains that he did not know the reason he was told he could not visit Tara Mendoza (the 72 hour no visit rule for new arrests), it was not unreasonable for Defendant Hernandez to assume he knew why he was told "no," and persisted to try to convince the officers to allow him to see Tara Mendoza. The Fourth Amendment tolerates objectively reasonable mistakes of fact or of law. *Heien v. North Carolina*, 135 S. Ct. 530, 539 (U.S. 2014). While Sergeant Pilakowski stated that Plaintiff did not state that he was asking for special treatment, considering the totality of the facts known to Defendant Hernandez, the Court cannot say that "all reasonable officers would agree there was no probable cause," *Rosenbaum,* at 1078, for her arrest of Plaintiff Mendoza.

### 2. *Plaintiff's Motion for Summary Judgment on Related Question*

To the extent the Plaintiffs move for summary judgment on their fourth amendment claim by asserting that Defendant Hernandez violated Washington law by arresting Mr. Mendoza for a misdemeanor committed outside her presence, their motion (Dkt. 68) should be denied. Under RCW 10.31.100, a "police officer may arrest a person without a warrant for committing a

misdemeanor or gross misdemeanor only when the offense is committed in the presence of an officer," with listed exceptions that do not apply here. The Ninth Circuit has specifically considered whether violation of RCW 10.31.100 (or other state laws requiring the officer be present to arrest for a misdemeanor) constitutes a violation of the Fourth Amendment and has concluded that it does not. *Alford v. Haner,* 446 F.3d 935, 937 n.2 (9th Cir. 2006)(rejecting plaintiff's argument that the violation of RCW 10.31.100 violated his fourth amendment rights); *Barry v. Fowler,* 902 F.2d 770, 772 (9th Cir. 1990)(holding that the "requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment"). As it relates to the federal claim of violation of his fourth amendment constitutional rights ONLY, Plaintiffs' motion for summary judgment on whether Defendant Hernandez violated Washington law by arresting Mr. Mendoza for a misdemeanor committed outside her presence, the motion (Dkt. 68) should be denied.

E. **FEDERAL CLAIM FOR VIOLATION OF THE FOURTEENTH AMENDMENT RELATED TO THE DECEMBER 10, 2014 INCIDENT INVOLVING L.M. ASSERTED AGAINST DEFENDANT KIPP**

The Defendants move for dismissal of Plaintiffs' Fourteenth Amendment claim related to Defendant Kipp taking L.M. into protective custody on December 10, 2014 arguing that Defendant Kipp is entitled to qualified immunity. Dkt. 58. Plaintiffs move for summary judgement on a related questions: (a) whether Defendant Kipp "had probable cause to believe L.M. had been neglected?" and (b) whether Defendant Kipp had "legal authority to under the Interlocal Agreement "when in Oregon to exercise her authority under RCW 26.40.050 to remove a child located in Oregon from its parent without a court order or warrant for a misdemeanor committed outside her presence?" Dkt. 68.

1. *Defendants' Motion - Qualified Immunity?*

The fourteenth amendment "substantive due process right to family integrity or to familial association is well established. A parent has a 'fundamental liberty interest' in companionship with his or her child." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011); (*quoting Kelson v. City of Springfield*, 767 F.2d 651, 654–55 (9th Cir. 1985)). The Fourteenth Amendment, then, "guarantees that parents will not be separated from their children without due process of law except in emergencies." *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007)(*quoting Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001)). Officials violate this constitutional right to familial unity "if they remove a child from the home absent information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Id.* (*internal quotations omitted*).

It is not clear from the Complaint whether Plaintiffs are also making a Fourth Amendment claim on behalf of L.M. under the Fourth Amendment regarding L.M.'s having been taken from his father without a warrant. Dkt. 2-1, at 19. The Complaint provides that "Defendants, in violation of Plaintiffs' right to familial association under the Fourteenth Amendment to the United States Constitution, unlawfully and without [a] warrant, removed L.M. from the custody, control, and care of [Plaintiff] Mendoza." *Id.* It is immaterial for purposes of this analysis because "the tests under the Fourth and Fourteenth Amendment for when an official may remove a child from parental custody without a warrant are equivalent." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 789 (9th Cir. 2016). Accordingly, under both the Fourteenth and Fourth Amendments, "seizing a child without a warrant is excusable only when officials have

reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Id.,* at 790.

As above, in considering whether an official is entitled to qualified immunity, the Court may consider the second *Saucier* factor first: whether the Plaintiffs' constitutional rights were clearly established when viewed in the specific context of this case. *Pearson,* at 236. Again, "[t]o determine whether a right is clearly established, the reviewing court must consider whether a reasonable official would recognize that his or her conduct violated that right under the circumstances faced, and in light of the law that existed at that time." *Kirkpatrick,* at 792 (*internal quotations omitted*). Although "specific binding precedent is not required to show that a right is clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (*internal quotations omitted*).

Defendant Kipp should be granted qualified immunity for taking L.M. into protective custody on December 10, 2014. "It was not beyond debate that the confluence of factors [here] would not support a finding of exigency." *Kirkpatrick*, at 793. The Friday night Defendant Kipp took custody of L.M., she was aware that a few days after the dependency was dismissed (based, in part, on Plaintiff Mendoza's assertions that he was going to California with L.M. and there were several no contact orders in place to protect L.M. from Tara Mendoza), Plaintiff Mendoza moved to have at least some of the no contact orders dismissed, stating that:

> CPS dismissed their action against my wife and I as relates to our son L. Based upon all information I have received to date I intend to facilitate reunification of the relationships damaged by what appear to be untrue allegations. As to this incident I acknowledge it occurred but have no fear of her and I want her in our son's life.

Dkt. 98, at 29. She knew that one of the central issues in the first dependency was Plaintiff Mendoza's failure to recognize the danger Tara Mendoza posed to his baby. It was not

unreasonable for her to be concerned that a woman so irrational as to break eight bones in a one-year-old baby's body would be highly unpredictable around the baby and that Plaintiff Mendoza still did not appreciate the danger. Defendant Kipp reasonably thought that Plaintiff Mendoza lied regarding his whereabouts a few hours earlier, telling staff he was in North Carolina when he was still in Vancouver. She was aware that they had not been able to find Tara Mendoza and that there were allegations that Tara Mendoza had made contact with the baby recently in violation of the no contact orders. Defendant Kipp did not know where Plaintiff Mendoza was headed. Even after she made contact with him, considering his prior interactions with her and others at DSHS, it was not unreasonable for her to question his credibility. A reasonable officer in Defendant Kipp's position would have cause to believe that L.M. is "likely to experience serious bodily harm in the time it would have taken to get a warrant," that is, that he was "in imminent danger of serious bodily injury." *Kirkpatrick,* at 790. Moreover, "[n]o Supreme Court precedent defines when a warrant is required to seize a child under exigent circumstances," *Kirkpatrick,* 793, and Plaintiffs have failed to point to any Ninth Circuit cases that address the circumstances alleged here. The federal constitutional claims asserted against Defendant Kipp should be dismissed based on qualified immunity.

2. *Plaintiffs' Motion for Summary Judgment – on the Questions of Whether Defendant Kipp had Sufficient Cause under State Statutes or Other Legal Authority to Take L.M.?*

To the extent that Plaintiffs move for summary judgment against Defendant Kipp on their federal constitutional claims by arguing that she did not have sufficient cause to take L.M. under the state statutes or other legal authority under state law (Dkt. 68) the motion should be denied. As was the case with Plaintiff Mendoza's Fourth Amendment claim, they make no showing that they are entitled to relief under § 1983 due to an asserted violation of a state law. Moreover, as

above, she is entitled to qualified immunity as to their fourth and fourteenth amendment claims. As the issues relate to their state law claims, this motion (Dkt. 68) should be stricken, as explained below, to be renoted if appropriate.

## F. FEDERAL CONSTITUTIONAL CLAIMS AGAINST THE CITY OF VANCOUVER PURSUANT TO *MONELL*

A county or municipality is responsible for a constitutional violation only when an action taken pursuant to a county or municipal policy of some nature caused the violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to successfully plead §1983 liability on the part of the City, Plaintiffs must allege: (1) they were deprived of a constitutional right; (2) the City had a policy; (3) the policy amounted to a deliberate indifference to their constitutional rights; and (4) the policy was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001)(*internal quotations omitted*).

Plaintiffs' federal constitutional claims asserted against the City of Vancouver should be dismissed because they failed to make a showing as to either prong (3) or (4). Plaintiffs assert that the City of Vancouver's Policy 17.15.00, and specifically 17.15.02C "is so deficient as to amount to deliberate indifference to L.M.'s constitutional right" because it "omits from the written policy the requirement that a child cannot be picked up without a court order." Dkt. 83, at 27. Plaintiffs cite to no authority that this proposition: "the requirement that a child cannot be picked up without a court order" is based on federal law; they cannot, because as above, children can be taken from their parents without a court order or warrant if the officer reasonably concludes the child is "likely to experience serious bodily harm in the time it would have taken to get a warrant," that is, that he was "in imminent danger of serious bodily injury." *Kirkpatrick*, at 790. Further, Plaintiffs point to no evidence that the City's policy "amounted to deliberate

indifference to their constitutional rights." They also do not show that the policy was "the moving force behind the constitutional violation."

To the extent Plaintiffs base their federal constitutional claims against the City of Vancouver on a failure to train, the claim should be dismissed. "A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." *Id.* A municipal entity can also be held liable if the plaintiff can establish that that entity failed to adequately supervise employees. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989). The standard for entity liability under a failure to supervise theory is the same standard used under a failure to train theory. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989); *Davis*, 869 F.2d 1230, 1235 (9th Cir. 1989). When a city is on actual or constructive notice that a particular omission in their training program causes employees to violate constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). Therefore, to prevail under a failure to supervise claim, a plaintiff must first demonstrate that the entity was on notice of a constitutional violation, and then show a conscious or deliberate choice between separate courses of action on the part of the entity regarding its supervisory authority. *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008). Courts use an objective standard to infer constructive notice of the risk where it was obvious. *Id.*

Plaintiffs' claims against the City, based on a failure to train and or supervise, should be dismissed. Plaintiffs failed to adequately show that policymakers were on actual or constructive

1 notice that their training programs or failures to supervise were causing violations of

2 constitutional rights. They fail to show the how the City acted with deliberate indifference. *See*

3 *City of Canton v. Harris*, 489 U.S. 378, 392 (1989). Defendants' motion (Dkt. 58) should be

4 granted as to these claims.

### G. STATE LAW CLAIMS

6 Jurisdiction is a threshold issue that must be raised *sua sponte*. *Steel Co. v. Citizens for a*

7 *Better Environment*, 523 U.S. 83, 94-95 (1998). As is relevant here, a federal court has original

8 jurisdiction over cases involving federal questions, 28 U.S.C. § 1332, or where the parties are

9 diverse citizens and the amount in controversy is over $75,000, 28 U.S.C. § 1331. A federal

10 court may exercise supplemental jurisdiction over state law claims asserted in cases in which the

11 court has original jurisdiction. 28 U.S.C. § 1367(a).

12 This case was removed based on federal question jurisdiction. Dkt. 1, at 2. As discussed

13 above, the federal claims are dismissed from the case.

14 It is not clear whether Court has original jurisdiction based on the parties' citizenship. All

15 Defendants are Washington residents. The Complaint does not state whether Plaintiffs are still

16 residents of the state of Washington or whether they have become residents of North Carolina. It

17 provides that Plaintiff Mendoza "was a married person . . . and father of L.M., residing in Clark

18 County Washington and Onslow County, North Carolina." Dkt. 20-1, at 8. The diversity

19 jurisdiction statute, 28 U.S.C. § 1332, speaks of citizenship, not of state of residency. *Kanter v.*

20 *Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001). "A person's state citizenship is

21 determined by [their] state of domicile, not [their] state of residence. A person's domicile is

22 [their] permanent home, where [they] reside[] with the intention to remain or to which [they]

23 intend[] to return." *Id.* A person is not necessarily a citizen of the state in which they reside for

24

purposes of the jurisdictional statute.  *Id.*  The Court is aware that Plaintiff Mendoza is active

duty military stationed North Carolina.  It is not clear from the record whether Plaintiffs are

citizens of Washington or North Carolina.  Moreover, it is not clear whether the value of the

remaining claims is over $75,000.

Accordingly, it is not clear whether the Court has original jurisdiction based on diversity and

the amount in controversy. The parties should be ordered to show cause, if any they have, why

this Court has original jurisdiction over this case under 28 U.S.C. § 1332 by September 7, 2017.

If it does not have original jurisdiction, the Court will then need to consider whether to

exercise its supplemental jurisdiction over the remaining state law claims.

Pursuant to 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental

jurisdiction over a state law claims if:  (1) the claims raise novel or complex issues of state law,

(2) the state claims substantially predominate over the claim which the district court has original

jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction,

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

"While discretion to decline to exercise supplemental jurisdiction over state law claims is

triggered by the presence of one of the conditions in § 1367(c), it is informed by the values of

economy, convenience, fairness, and comity." *Acri v. Varian Associates, Inc*., 114 F.3d 999,

1001 (9th Cir. 1997)(*internal citations omitted*).

Although "it is generally within a district court's discretion either to retain jurisdiction to

adjudicate the pendent state claims" or dismiss them without prejudice, or if appropriate, remand

them to state court," *Harrell v. 20th Ins. Co.,* 934 F.2d 203, 205 (9th Cir. 1991), in the interest of

fairness, the parties should be given an opportunity to be heard on whether the case should be

remanded for further proceedings.  Accordingly, the parties should be ordered to show cause, in

writing, if any they have, by September 7, 2017, why this Court should not decline to exercise supplemental jurisdiction over the state law claims and remand the case to Clark County, Washington Superior Court.  In the meantime, Defendants' Renewed Motion to Exclude Gregory Gilbertson (Dkt. 73) and the remaining issues in motions for summary judgment (Dkts. 58 and 68), which are based entirely on state law, should be stricken, but may be renoted if the Court ultimately decides to exercise supplemental jurisdiction.

### III.  ORDER

Therefore, it is hereby **ORDERED** that:

- Plaintiffs' Motions to Strike (Dkts. 68 (refiled in the record at 86 and 87) and 97) **ARE DENIED**;

- Defendants' Motion for Summary Judgment (Dkt. 58) **IS**:

    - **GRANTED** as to the federal claims;

        - The federal claims asserted against all Defendants **ARE DISMISSED**;

    - **STRICKEN** as to the state law claims;

- Plaintiffs' Motion for Partial Summary Judgment (Dkt. 68) **IS**:

    - **DENIED** to the extent the motion applies to the federal claims;

    - **STRICKEN** as to the state law claims; and

- Defendants' Renewed Motion to Exclude Gregory Gilbertson (Dkt. 73) **IS STRICKEN**, to be renoted if the Court decides to exercise supplemental jurisdiction over the state law claims;

- The parties are ordered to show cause, in writing, if any they have, why this Court has original jurisdiction over this case under 28 U.S.C. § 1332 by **September 7, 2017**;

- The parties are further ordered to show cause, in writing, if any they have, by **September 7, 2017**, why this Court should not decline to exercise supplemental jurisdiction over the state law claims and remand the case to Clark County, Washington Superior Court**.**

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 29th day of August, 2017.

*Robert J. Bryan*
ROBERT J. BRYAN
United States District Judge

# LIST OF PEOPLE INVOLVED

**Plaintiff Carlos Mendoza**: father to Plaintiff L.M., former husband of Tara Mendoza and activity duty Marine;

**Plaintiff L.M.**: child of Plaintiff Mendoza and Tara Mendoza; Tara Mendoza pleaded guilty to assaulting him;

**Tara Mendoza**: Plaintiff Mendoza's first wife, mother of L.M., pleaded guilty to assaulting L.M.;

**Defendant Vancouver Police Department Detective Monica Hernandez:** arrested Plaintiff Mendoza on May 6, 2014; arresting officer and investing officer in the case against Tara Mendoza for abusing L.M.

**Karen Ruggiero**: a friend of Tara Mendoza and a witness in the child abuse case against Tara Mendoza; arrived at Taryn Park's home looking for Ms. Park's phone allegedly at Plaintiff's request while Defendant Hernandez was executing a warrant

**Taryn Park:** friend of Tara Mendoza and witness to the child abuse case against Tara Mendoza;

**Sandra Schatz**: owner of residence where Plaintiff Mendoza allegedly hid Tara Mendoza's phone;

**Scott Pilakowski**, the corrections sergeant and supervisor on duty at the jail for the Clark County Sheriff's Office on May 2, 2014, the day Plaintiff Mendoza visited Tara Mendoza contrary to jail rules;

**Custody Officer Paddy**:  custody officer at the Clark County Washington jail; also working at the visitor's desk around 5:00 p.m. on May 2, 2014;

**U.S. Marine Corp Major Chad Hailey:** told Defendant Hernandez that on May 2, 2014 around 2:00 p.m. he told Plaintiff Mendoza that he would be allowed to stay in Washington through the duration of the [dependency] case involving L.M.;

**Colin Hayes**: the Clark County deputy prosecutor who was handling Tara Mendoza's criminal prosecution;

**Sarra Yamin:** the assistant attorney general who was assigned to the first dependency case.

**Defendant Vancouver Police Department Detective Sergeant Barbara Kipp:** took L.M. into protective custody on December 10, 2014;

**Cheri Hoffman**: a volunteer victim's advocate to whom Plaintiff allegedly told he was in North Carolina when he was still in Vancouver, Washington on December 10, 2014;

**Brendan McCarthy**: Clark County Deputy Sheriff that began drafting an affidavit for a warrant to take L.M. back into protective custody; quit to help follow Plaintiffs

**Michael Wenndorf**: social worker assigned to the second dependency;

**Carin Schienberg**: Clark County, Washington Superior Court Commissioner who presided over both dependencies;

**Yesenia Mendoza**: Plaintiff Mendoza's second wife and stepmother to Plaintiff L.M.